**LUCENT INFORMATION MANAGEMENT, INC.,**
**Plaintiff,**

v.

**LUCENT TECHNOLOGIES, INC., Defendant.**

**Civil Action No. 96–450–RRM.**

United States District Court, D. Delaware.

March 24, 1998.

N. Richard Powers, Harold Pezzner, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Richard I. Samuel, Jill C. Greenwald, Cobrin Gittes & Samuel, New York City, for Plaintiff.

Donald F. Parsons, Jr., Karen L. Pascale, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Robert M. Newbury, Mark V.B. Partridge, Bradley L. Cohn, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, Mari M. Gursky Shaw, Lauren S. Kellner, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a trademark case. Plaintiff Lucent Information Management, Inc. ("LIM") is a Pennsylvania corporation specializing in computer document management systems. Defendant Lucent Technologies, Inc. ("LTI") is a Delaware corporation that provides goods and services in telecommunication and information systems.

LIM filed a complaint on September 12, 1996, alleging that LTI is engaging in trademark infringement in violation of federal law, 15 U.S.C. § 1125(a), through its use of the mark LUCENT. LIM also alleged that LTI is engaging in service mark infringement, tradename infringement, unfair competition under Delaware common law, and is violating the Delaware Uniform Deceptive Trade Practices Act, Del. code ann. tit. 6, § 2532 (1974). These claims are listed as Counts I through V in LIM's complaint.

During the course of discovery, LTI hired Data Development Corporation ("DDC") to conduct a survey on the issue of likelihood of confusion of the companies' use of the LUCENT mark. As part of this survey, DDC used letters that were very similar to a letter sent out by LIM in September, 1995. After learning of the survey, LIM registered its letter with the United States Copyright Office in February, 1997. On May 14, 1997, LIM filed a supplemental complaint, adding five additional claims. The first four new claims, Counts VI through IX, each pertain to the use of LIM's copyrighted letter in the DDC survey. The claims are for copyright infringement, tortious interference with prospective business relations, violation of the Lanham Act, and trade libel. The final claim, Count X, is in response to LTI's claim that letters between the parties prior to litigation constitute an agreement in principle by LIM not to sue. Count X alleges that if these letters do constitute an agreement, then LTI is liable for fraud in the inducement.

On July 3, 1997 LTI moved for summary judgment as to Counts I through V. On July 16, 1997, LTI moved for summary judgment on Counts VI through X. On November 5, 1997, the court granted summary judgment to LTI on Counts I through V, on the ground that LIM had not established ownership rights in the mark prior to LTI's filing of an intent-to-use application with the Patent and Trademark Office ("the PTO"). A copy of the court's opinion is reported at *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 986 F.Supp. 253, 1997 WL 739528 (D.Del. Nov.5, 1997). This is the court's decision on LTI's motion for summary judgment on Counts VI through X.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the parties' pleadings, the parties' briefs, and evidentiary submissions accompanying the briefs.

LIM was formed in 1995 by four individuals: Norman Feinstein, Samuel Weinberg, Edward Eisen, and Cliff Armstrong. They formed the company in order to offer services for document imaging and management. On August 22, 1995, the company filed Articles of Incorporation in the Commonwealth of Pennsylvania under the name "Lucent Systems Corporation." On September 22, 1995, the company changed its name to Lucent Information Management.

LIM's office was set up using space within the building owned by Mr. Feinstein's other business, Corporate Consultants, Inc. On September 5, 1995, Mr. Feinstein sent out a letter on Corporate Consultants letterhead to approximately 50 people, announcing the formation of LIM and the goals of the company.

On November 30, 1995, AT & T filed an intent-to-use application with the PTO for the mark LUCENT. On February 5, 1996, AT & T announced that it was forming a spinoff company that would be named "Lucent Technologies, Inc."

On March 15, 1996, LIM's trademark attorney, John Caldwell, sent a letter to LTI objecting to LTI's use of the name LUCENT, and claiming that LIM had already adopted this name on a nationwide basis. On April 12, 1996, LTI's trademark counsel, R.A. Ryan, responded. Ryan stated that she did not agree that LTI's use of the name Lucent

Technologies created a likelihood of confusion, and that in her opinion the companies' markets did not overlap.

On April 29, 1997, LIM filed an application with the PTO to register the mark LUCENT for computer and office-related services. Caldwell sent LTI a letter and attached a proposed agreement, in which each party would agree to refrain from opposing the other's registration of the mark LUCENT, and to use trade dress, advertising and marketing in a way that would avoid significant likelihood of confusion. The parties never signed the agreement.

On June 25, 1996, Richard Samuel wrote a letter to Ryan at LTI indicating that he was taking over representation of LIM in the matter, and that any previous offers of settlement by LIM were withdrawn. On September 12, 1996, LIM filed suit against LTI.

As part of its preparation for trial, LTI hired DDC to conduct a survey to determine the extent to which consumers might be confused by the use of the LUCENT mark by the two companies. As part of this survey, DDC distributed two letters that were very similar to the September 5, 1995 letter that LIM sent to potential customers. The first letter is an almost exact duplicate—the only differences are the letterhead (Lucent Information Management, Inc. instead of Corporate Consultants, Inc.), and the date (February 2, 1997 instead of September 5, 1995). The second letter is similar to LIM's letter, but introduces the services of a fictitious company called "Lucent Lighting Management."

DDC conducted the survey among professionals who are involved or plan to be involved in their companies' purchase decisions for office automation products and services. DDC sent the survey to the prospective participants via Federal Express, with instructions not to open the package until they received a phone call from the entity conducting the survey. DDC paid participants for taking part in the survey.

On February 5, 1997, one of the participants in the survey, Paul H. Ripley, called LIM and spoke with Feinstein. Ripley assumed that LIM was running the survey, and he told Feinstein that he believed the survey was a waste of LIM's money. Ripley claimed that the questions seemed unimportant and that the person asking the questions seemed uninterested in the answers.

On February 7, 1997, another participant, Herman T. Fishbein, wrote a letter to Feinstein at "Loser Information Management" to complain about the survey. Fishbein claimed that he had been told he would be called at 10:30 a.m., but that no one ever called him. In his letter, Fishbein noted that he would have little faith in a company that could not even make a phone call at an agreed-upon time.

On February 7, 1997, LIM registered its September 5, 1995 letter with the United States Copyright Office. On May 14, 1997, LIM filed a supplemental complaint against LTI, adding Counts VI through X. Count VI alleges that LTI infringed LIM's copyright by using LIM's letter in the survey. Count VII alleges that LTI tortiously interfered with prospective business relations of LIM by distributing LIM's letter to prospective customers. Count VIII alleges that LTI violated the Lanham Act by publishing false and misleading statements about LIM through distribution of the letter. Count IX alleges that LTI engaged in trade libel. Finally, Count X alleges that LTI engaged in fraud in the inducement of a contract, if the court finds that the letters between the two companies before LIM filed suit constitute a valid agreement. On July 16, 1997, LTI moved for summary judgment on Counts VI through X.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B. *Is LIM's Copyright Infringement Claim Barred by the "Fair Use" Doctrine?*

Count VI of LIM's complaint alleges that LTI has infringed LIM's copyright by causing reproductions of the September 5, 1995 letter to be distributed in the DDC survey. Federal copyright law provides an exception to the prohibition on reproduction of a copyrighted work where the reproduction qualifies as "fair use." 17 U.S.C. § 107. The statute describes as fair use those instances where the reproduction is used for "such purposes as criticism, comment, news reporting, teaching ..., scholarship, or research."

■■■ Application of the fair use doctrine "always depends on consideration of the precise facts at hand." *American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 916 (2nd Cir.1994). The copyright statute lays out the factors that a court should consider when determining whether use of a work in a particular case is a fair use. They are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The court will consider each of these factors in turn.

1. *Purpose and character of use*

The first factor to consider is the way in which LTI used the copyrighted letter. While this factor may include several elements, the copyright statute specifically mentions commercial use as opposed to educational use. The Supreme Court has gone so far as to say that "every commercial use of copyrighted material is presumptively ... unfair." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). In *Jartech, Inc. v. Clancy,* 666 F.2d 403, 406 (9th Cir.1982), the Ninth Circuit found that defendants' copying of plaintiffs' copyrighted movies was fair use and noted that defendants "had not commercially exploited [plaintiffs'] copyright, but had used it ... for evidence [in a] nuisance abatement proceeding."

The Supreme Court has more recently pointed out that commercial use is "only one element of the first factor enquiry," *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 584, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), and noted that "the mere fact that a use is ... not for profit does not insulate it from a finding of infringement." *Id.* However, in that case the Court found that the Court of Appeals had erred in giving "virtually dispositive weight" to the commercial nature of the defendants' use. The Court expressed concern that assigning a presumption of unfairness to commercial use "would swallow nearly all of the illustrative uses listed" in section 107.

In contrast, the instant case involves the "exceptional case of nonprofit exploitation." *American Geophysical,* 60 F.3d at 921. LTI has only used LIM's letter in a survey, as part of its preparation for litigation. LIM does not claim that there are customers willing to buy copies of this letter, or that LTI is somehow profiting from the survey it is conducting. Thus, this first factor weighs in favor of a finding of fair use.

2. *Nature of the copyrighted work*

The second factor takes into account the "measure of creativity" of the copyrighted work. *American Geophysical,* 60 F.3d at 925. This factor recognizes that "some works are closer to the core of intended copyright protection than others." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. For instance, in *American Geophysical,* 60 F.3d at 925, the Second Circuit found this second factor weighed in favor of a finding of fair use where the scientific articles in question were of a "manifestly factual character."

In this case, the work in question is a letter. It is not meant to be creative or original. It merely communicates to poten-

tial customers the fact that LIM is being formed. Thus, this factor also weighs in favor of a finding of fair use.

### 3. Amount and substantiality of portion used

The third factor calls for an analysis of the amount of the copyrighted work that has been reproduced. The greater the extent of copying, the less likely it will be that the use is fair. The DDC survey used the LIM letter in its entirety, with a few changes. Thus, the factor weighs against a finding of fair use.

### 4. Effect upon potential market value

Finally, the fourth factor calls for an analysis of the effect of the reproduction on the market for the copyrighted work. That is, whether "widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164.

As noted above, there is no potential market for LIM's letter. LTI is not selling the letter, and no one would be interested in buying it. LTI is simply using it in a survey, and LIM has apparently copyrighted the letter in order to prevent that survey. Thus, the court finds that this factor weighs in favor of a finding of fair use, and concludes that LIM's copyright infringement claim, Count VI, is barred because LTI's conduct qualifies as fair use.

### C. Should the Court Grant Summary Judgment to LTI on Count Seven?

■ In Count VII, LIM alleges that LTI's distribution of the survey among people who are potential LIM customers constitutes tortious interference with prospective business relations. LIM points to the responses of Ripley and Fishbein, who each complained to LIM about the survey, and who each apparently assumed that LIM had conducted the survey.

■ In Delaware, to establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferer;

(3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and

(4) resulting damages to the party whose relationship or expectancy has been disrupted.

*Dionisi v. DeCampli,* 1995 WL 398536 (Del. Ch. June 28, 1995). The plaintiff must be able to cite "actual or potential contracts." *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* 1995 WL 411319 (Del.Super.Ct. June 30, 1995) (granting summary judgment in the absence of such a citation).

LIM does not claim to have had any previous contact with any of the survey participants. It only makes the broad claim that the participants are "potential" customers, but does not cite any actual contract, or even contract discussions, with any of these parties. Thus, the court will grant summary judgment to LTI on Count VII.

### D. Should the Court Grant Summary Judgment to LTI on Counts Eight and Nine?

■ In Counts VIII and IX, LIM alleges that LTI violated the Lanham Act and engaged in trade libel by hiring DDC to conduct the survey. LTI counters that none of its "statements" were false, misleading, or defamatory.

■ In Delaware, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Bickling v. Kent General Hosp.,* 872 F.Supp. 1299, 1307 (D.Del.1994). Whether a statement is "capable of bearing a particular meaning, and whether that meaning is defamatory, is a question for the court." *Id.* Under the Lanham Act, a defendant is liable for "false or misleading" description or representation of fact. 15 U.S.C. § 1125.

Nothing in the DDC survey is false or misleading. The first letter is an exact copy of LIM's letter, except that the date matched

the date of the survey. The second letter describes a completely different service, and uses a different company name (Lucent Lighting Management). The court finds no basis for LIM's Lanham Act and trade libel claims, and thus will grant summary judgment to LTI on Counts VIII and IX.

E. *Should the Court Dismiss LIM's Claim for Fraud in the Inducement?*

On November 5, 1997, the court granted summary judgment to LTI on LIM's trademark infringement claims. Both parties agree that LIM's fraud in the inducement claim, Count X, becomes moot with that decision. Thus, the court will grant summary judgment to LTI on Count X of LIM's complaint.

III. *CONCLUSION*

For the reasons set out above, the court finds that Count VI of LIM's complaint is barred by the fair use doctrine, codified at 17 U.S.C. § 107. The court also finds no factual basis for Counts VII through IX. Thus, the court will grant summary judgment in favor of LTI and against LIM on Counts VI through IX of LIM's complaint. Finally, the court will grant summary judgment in favor of LTI and against LIM on Count X of LIM's complaint.

The court will enter an order in accordance with this memorandum opinion.